## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT L. HOLBROOK, | ) | |
| Plaintiff, | ) | Civil Action No. 10-265PITTSBURGH |
| | ) | |
| v. | ) | District Judge McLaughlin |
| | ) | |
| CAPTAIN JOHN KINGSTON, et al, | ) | Magistrate Judge Baxter |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.      RECOMMENDATION

It is respectfully recommended that Defendants' motion for summary judgment [ECF No. 63] be granted.  The Clerk of Courts should be directed to close this case.

### II.      REPORT

#### A.  Relevant Procedural History

Plaintiff, a state inmate acting *pro se*, initiated this civil rights action in February 2010. Plaintiff alleges that prison officials at the State Correctional Institution at Greene ("SCI-Greene") interfered with his mail, and he seeks monetary damages and declaratory relief[1] for

---

[1]  As to the declaratory relief, Plaintiff seeks "a declaratory judgment that Defendants violated Plaintiff's First Amendment rights of freedom of expression and freedom of the press by placing him on Mail Watch from February 2007 to March of 2008 in retaliation for Plaintiff's cooperation with activists monitoring prisoner abuse and the content of Plaintiff's articles criticizing SCI Greene and Department of Correction policies and allegations of prisoner abuse." ECF No. 6, ¶ 58.

violations of his constitutional rights under 42 U.S.C. § 1983. Named as Defendants are:
Captain John Kingston; Captain Craig Haywood; and Superintendent Louis Folino. All three
Defendants are named in their official[2] and individual capacities.

This Court has repeatedly construed the factual allegations of the Original Complaint as
raising three distinct causes of action: 1) violation of the First Amendment when prison officials
opened and read Plaintiff's outgoing and incoming nonlegal mail; 2) violation of the First
Amendment when prison officials opened and read a letter from Plaintiff's attorney outside of
his presence in January 2007[3]; and 3) violation of the First Amendment when prison officials
placed Plaintiff on "Mail Watch" between February 6, 2007 and March 6, 2008 in retaliation for
Plaintiff's past correspondence with religious and prison watch-dog groups. See ECF Nos. 30,
60.

On January 21, 2011, Plaintiff amended the Original Complaint to add new details
concerning the prison mail watch.[4] ECF No. 24. In response, Defendants filed a motion to
dismiss arguing that all three claims were time-barred in their entirety, and alternatively, that
Plaintiff's allegations failed to state a claim upon which relief could be granted. ECF No. 25.

On August 4, 2011, the undersigned issued a Report and Recommendation
recommending that the motion to dismiss be granted in part and denied in part: "the interference

---

[2] Although all three Defendants were named in both their official and individual capacities, the
official capacity claims have previously been dismissed for failure to state a claim upon which
relief may be granted. See ECF No. 60, page 2 n.2. See also Edelman v. Jordan, 415 U.S. 651
(1974) (the Eleventh Amendment proscribes actions in federal courts against state employees
acting in their official capacity).

[3] Although Plaintiff alleges that the legal mail was opened in January of 2007, the exhibits
attached to the Original Complaint by Plaintiff indicate that the correct date is January of 2008.
See ECF No. 6-15.

[4] Because Plaintiff is a *pro se* litigant, this Court liberally construed the Amended Complaint as
a supplement to the Original Complaint. See ECF No. 30, page 2 n.2.

with Legal and nonlegal mail claims should be dismissed as they are barred by the statute of limitations, while the retaliation claim should remain pending as it is not completely barred by the statute of limitations and Plaintiff has not failed to state a *prima facie* claim upon which relief may be granted." ECF No. 30. Plaintiff filed Objections to the Report and Recommendation explaining that the opening of his mail was not limited to a single incident, but that the Magistrate Judge should have applied the continuing violations doctrine and "assumed that all of Plaintiff's correspondence was opened and read" without Plaintiff having to list every single incident of mail opening. ECF No. 31.

By Order dated September 15, 2011, District Judge McLaughlin adopted the Report and Recommendation in part, holding:

> "After a *de novo* review of the documents in the case, together with the Report and Recommendation and objections thereto, I agree that the motion to dismiss should be denied with respect to the retaliation claim and adopt the Magistrate Judge's Report and Recommendation with respect to this claim. The Report and Recommendation is not adopted, however, with respect to the interference with legal and non-legal mail claims. The Court finds that the continuing violation doctrine may apply to these claims as the Plaintiff has alleged that he was on Mail Watch until March 2008."

ECF No. 34. Therefore, all three distinct causes of action survived the first dispositive motion.

On November 15, 2011, Plaintiff filed a short Second Amended Complaint (ECF No. 51) which this Court liberally construed as a supplement to Plaintiff's previously-filed pleadings. See ECF No. 60, page 4. In that document, Plaintiff alleged:

> On December 6, 2007, Ms. Theresa Shoats, a Human Rights Coalition activist Plaintiff corresponded with about the abuse of prisoners at SCI Greene sent Plaintiff a letter and a newspaper article about racism at SCI Greene.
>
> Plaintiff had requested the article based on the behavior of guards at SCI Greene that Plaintiff found to be racist and offensive.

> SCI Greene returned the letter to Ms. Theresa Shoats without notifying Plaintiff of the denial.
>
> Plaintiff was not aware of the denial of the letter until several months later when Ms. Shoats sent him a copy of a letter from the institution justifying the denial of the letter.
>
> Plaintiff filed a grievance over the denial of the letter but the grievance was not addressed. In additional at this point SCI Greene had stopped processing complaints by the Plaintiff over the Mail Watch or the monitoring of his mail because the issue was addressed and resolved in Grievance No. 190650 by the Department of Corrections Central Office on Final Review.

ECF No. 51.

Thereafter, Defendants filed two partial motions for judgment on the pleadings. ECF Nos. 37 and 49 (ECF No. 37, filed in response to the Original and First Amended Complaints, and ECF No. 49, filed in response to the Second Amended Complaint). Defendants moved for judgment as to Plaintiff's first two claims: 1) the opening and reading of Plaintiff's outgoing and incoming nonlegal mail; and 2) the opening and reading of a letter from Plaintiff's attorney outside of his presence on January 24, 2007. Plaintiff filed a brief in opposition to those motions (ECF No. 55).

By Report and Recommendation filed April 30, 2012, the undersigned recommended that the motions for judgment on the pleadings be granted in part and denied in part. More specifically, Defendants' motions for judgment on the pleadings be granted as to the claim that the opening of his outgoing legal mail violated his constitutional rights as he has failed to state a claim upon which relief may be granted, while Defendants' motions for judgment on the pleadings be denied in all other regards. ECF No. 60. By Order dated June 28, 2012, Judge McLaughlin adopted the Report and Recommendation as the opinion of the Court. ECF No. 68.

Therefore, the remaining claims (as construed by this Court) are:

(1) Violation of the First Amendment when prison officials opened and read Plaintiff's **incoming** nonlegal mail;

(2) Violation of the First Amendment when prison officials opened and read a letter from Plaintiff's attorney outside of his presence in January 2007/2008 (see footnote 3); and

(3) Violation of the First Amendment when prison officials placed Plaintiff on "Mail Watch" between February 6, 2007 and March 6, 2008 in retaliation for Plaintiff's past correspondence with religious and prison watch-dog groups.

ECF No. 6.

Thereafter, Defendants filed a motion for summary judgment. ECF No. 63. In opposition to the motion for summary judgment, Plaintiff has filed a brief as well as a Statement of Disputed Material Facts and Exhibits. ECF Nos. 70-72. This matter is fully briefed and is ripe for disposition by this Court.

### B. Standards of Review

#### 1) *Pro Se* Litigants

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-521 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Dep't of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a

complaint in favor of the complainant. <u>Gibbs v. Roman</u>, 116 F.3d 83 (3d Cir. 1997).  <u>See, e.g.</u>,

<u>Nami v. Fauver</u>, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard);

<u>Markowitz v. Northeast Land Co.</u>, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a

*pro se* litigant, this Court may consider facts and make inferences where it is appropriate.


### 2) Motion for summary judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted

if the "movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  The moving party has the initial burden of proving to

the district court the absence of evidence supporting the non-moving party's claims.[5]  <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); <u>Andreoli v. Gates</u>, 482 F.3d 641, 647 (3d Cir. 2007);

<u>UPMC Health System v. Metropolitan Life Ins. Co.</u>, 391 F.3d 497, 502 (3d Cir. 2004).   In

considering a motion for summary judgment, "the court is required to examine the evidence of

record in the light most favorable to the party opposing summary judgment, and resolve all

reasonable inferences in that party's favor."  <u>Wishkin v. Potter</u>, 476 F.3d 180, 184 (3d Cir.

2007).  <u>See</u> <u>also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

In order to defeat a motion under Rule 56, the party opposing the motion must cite to

specific materials in the record that demonstrate the existence of a disputed issue of material fact.

<u>See</u> Fed.R.Civ.P. 56(c)(1)(A).  A material fact is a fact that "might affect the outcome of the suit

under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  For a

disputed issue to be genuine, "all that is required is that sufficient evidence supporting the

---

[5]  "If the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'"  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) <u>quoting</u> <u>Wetzel v. Tucker</u>, 139 F.3d 380, 383 n.2 (3d Cir. 1998).

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. at 249.

The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories, and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 322-23. The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248-49.[6] In summary, "the inquiry in ruling on a Rule 56 motion is whether the evidence or record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is such that the

---

[6] However, a court need not "turn a blind eye to the weight of the evidence." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

movant must prevail as a matter of law." <u>Kravits v. Shinseki</u>, 2012 WL 604169, at *4 (W.D. Pa. Feb.24, 2012).

### C. Retaliation

#### 1) Construing Plaintiff's claims

Plaintiff argues that all of the challenged actions of Defendants Kingston, Haywood, and Folino were motivated by their retaliatory animus toward him based upon his extensive prior writings and publications.

Despite this Court's repeated recognition of three distinct claims based upon the factual scenario presented by Plaintiff in his pleadings, Plaintiff characterizes this entire lawsuit as one extended act of retaliation beginning in February of 2007 and ending in March of 2008. In the preliminary statement of his Original Complaint, Plaintiff characterizes this action:

> "this is a civil rights action asserting Defendants violated Plaintiff's First Amendment rights by placing him on a Department of Corrections Mail Watch list that allowed Defendants to read, photocopy and monitor <u>all</u> of Plaintiff's OUTGOING and INCOMING mail in retaliation for Plaintiff's cooperation with activist organizations monitoring abuse at SCI Green and in Department of Corrections prisons and because of the content of Plaintiff's articles published in media outlets that critics SCI Green and Department of Corrections policies and abusive practices."

ECF No. 6 (emphasis in original). In his present Opposition Brief, Plaintiff further explains that based upon his preliminary statement, he "has sufficiently alleged that ALL his OUTGOING and INCOMING mail was read, photocopied, and monitored by the Defendants between February of 2007 and March of 2008; not just the mail monitoring Plaintiff [specifically] mentioned within his Original Complaint." ECF No. 71, page 2 (emphasis in original).[7]

---

[7]  Defendants argue that Plaintiff was not on Mail Watch continuously from February of 2007 through March of 2008, but instead was on Mail Watch from February through June of 2007 and again from December 6, 2007 through March of 2008. Defendants have provided evidence in

Henceforth, this Court will construe the allegations of this action in accord with

Plaintiff's express intent. So then, Plaintiff's claim is that his constitutional rights were violated

continuously during the time period from February of 2007 through March of 2008 in one

continuous pattern/practice, the last violation occurring in March of 2008.[8] Additionally,

Plaintiff raises a First Amendment claim based upon the opening of a single piece of his legal

mail in January 2007/2008 (see footnote 3).

---

support of this version of events (see ECF No. 66-1, Declaration of Superintendent Louis Folino, ¶¶ 3, 8, 14, and page 8; ECF No. 66-2, Declaration of Captain John Kingston, ¶¶ 11-13, 19, and 23) and Plaintiff refutes this version of events with evidence of his own (see ECF No. 70-1, Affidavit of Plaintiff Holbrook, pages 1-14; ECF No. 70-2, Affidavit of Patricia Vickers, page 2; ECF No. 70-2, Affidavit of Richard Carter, page 3; ECF No. 70-2, Affidavit of David Fischer, pages 4-6; ECF No. 70-2, Affidavit of Elizabeth Anderson, page 11; ECF No. 70-2, Affidavit of John Dolley, Jr., page 16; ECF No. 70-2, Affidavit of Bret Grot, page 18). However, this disputed issue of fact is not material to the present legal analysis so as to preclude summary judgment as the resolution of this factual dispute does not affect the outcome under the law.

[8]  In construing Plaintiff's retaliation claim in this manner, his claim meets the criteria to satisfy the continuing violation doctrine so as to overcome the obvious time bar of the two-year statute of limitations. See Urrutia v. Harrisburg County Police Dept., 91 F.3d 451 (3d Cir. (Pa.) 1996); McCreary v. Redevelopment Authority of The City of Erie, 2011 WL 1848333, at *2 (3d Cir. 2011) citing Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009). In this case, Plaintiff's Original Complaint was received by the Clerk of Courts on February 24, 2010. See ECF No. 1. Thus, barring exception, any claims raised by Plaintiff arising from events that occurred prior to February 2008, are barred by the applicable statute of limitations.

 "The continuing violation doctrine [...] is an 'equitable exception to the timely filing requirement.'" Voices for Independence (VFI) v. Pennsylvania Dept. of Transp., 2007 WL 2905887, at * 4 (W.D.Pa.) quoting Cowell  v. Palmer Township, 263 F.3d 286, 292 (3d Cir. 2001). "The application of the continuing violations theory may be appropriate in cases in which a plaintiff can demonstrate that the defendant's allegedly wrongful conduct was part of a practice or pattern of conduct in which he engaged both without and within the limitations period." McAleese v. Brennan, 483 F.3d 206, 218 (3d Cir. 2007) citing West v. Philadelphia Elec. Comp., 45 F.3d 744, 754 (3d Cir.1995). In other words, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Muhammad v. Court of Common Pleas of Allegheny County, Pa., 2012 WL 1681861, at * 2 (3d Cir. May 15, 2012) quoting  Brenner v. Local 514, United Bhd. Of Carpenters and Joiners of America, 927 F.2d 1283, 1295 (3d Cir. 1991).

## 2) Legal Standard

It is well settled that retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution, which is actionable under § 1983. Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990). "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). See also Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) ("[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech.").

In Rauser, the Third Circuit set forth with specificity the elements of a prisoner's cause of action for retaliation and the burden of proof he must carry to succeed on such a claim. 241 F.3d at 333. "As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected."[9] Id. "Next, a prisoner litigating a retaliation claim must show that he suffered some 'adverse action' at the hands of the prison officials." Id. Then, a plaintiff must prove "a causal link[10] between the

---

[9] Plaintiff contends that his allegation that his "writings and articles published that criticized abuse within the SCI Greene, Department of Corrections, and injustice in general as well as his cooperation with outside activists and advocacy organizations monitoring abuse with SCI Greene and Department of Corrections' prisons" satisfies the constitutionally protected conduct element. ECF No. 71, page 31 citing ECF No. 6, Original Complaint, at ¶ ¶ 48-9.

[10] In order to establish the requisite causal connection," the plaintiff usually must prove one of two things: (1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with time to establish a causal link." DeFranco v. Wolfe, 387 Fed.Appx 147, 154 (3d Cir. 2010) citing Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3 259, 267 (3d Cir. 2007). If the plaintiff does not show either of these, then the plaintiff must show that, from the evidence in the record as a whole, the trier of fact

exercise of his constitutional rights and the adverse action taken against him." Id.[11]  See also Whitehead v. Rozum, 2012 WL 4078422, at *4 (W.D. Pa. Aug. 14, 2012) citing Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977) (the third element characterized as "the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.").

In establishing the three elements of a retaliation claim, the plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation.  Crawford-El v. Britton, 523 U.S. 574, 600 (1998). Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner.  See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

After a plaintiff has met his initial burden to show the three elements of the *prima facie* case, the burden then shifts to the defendant to "prove by a preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity." Rauser, 241 F.3d at 333.

---

should infer causation.  Id.  "'It is important to emphasize,' however, 'that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.'" Washington-El v. DiGuglielmo, 419 Fed.Appx 275, 280 (3d Cir. 2011) quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).  Even in the absence of temporal proximity, "a plaintiff can show 'that from the evidence gleaned from the record as a whole the trier of fact should infer causation.'"  Id. quoting Lauren W., 480 F.3d at 267.

[11]  "The Third Circuit instructs district courts to 'be diligent in enforcing these causation requirements' in recognition of the fact that public actors 'must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiff's ask the courts to second guess the actor's decisions.' " Lauren W., 480 F.3d at 267-68.

Defendants move for summary judgment against Plaintiff's retaliation case. Defendants' argument is two-fold: first, Plaintiff has not demonstrated adverse action sufficient to meet his burden at the second prong of the *prima facie* case, and second, if Plaintiff has met his burden of demonstrating a *prima facie* case, Defendants can prove that they would have taken the same action absent Plaintiff's constitutionally protected conduct.[12]

### 3) Adverse action

In order to show the adverse action necessary to fulfill the second prong of a retaliation claim, the prisoner-plaintiff must establish that the defendant's actions were "sufficiently [adverse] to deter a person of ordinary firmness from exercising his constitutional rights..." Huertas v. Sobina, 476 Fed.Appx 981, 984 (3d Cir. 2012). See also Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

Defendants argue that Plaintiff has not met his burden to show adverse action since:

> "he has not alleged that his mail – incoming or outgoing—was ever censored or destroyed. Holbrook does allege that these actions by the Corrections Defendants 'chilled the exercise of his First Amendment rights' by 'compelling him to cease' corresponding with other 'activist friends,' receiving publications critical of SCI Greene and/or the Department of Corrections and writing articles for such publications 'for fear of being placed in long term segregation as a radical Muslim prisoner.'"

ECF No. 64, page 30. This is the entirety of Defendants' argument in this regard.[13]

In opposition, Plaintiff argues:

---

[12] Defendants do not argue that Plaintiff fails to meet the first or third elements of the *prima facie* retaliation case.

[13] Defendants do not provide evidence in support of this argument nor do they need to as it is Plaintiff's burden at trial to demonstrate all three elements of the retaliation case. See Kaucher, 455 F.3d at 423 ("If the non-moving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.").

> "While Defendants brief suggests that plaintiff suffered no adverse action because in the end, he was not placed in the Restrictive Housing Unit as a result of the Mail Watch, plaintiff must disagree. For one, all of Plaintiff's Outgoing and Incoming mail, including personal and intimate correspondence, was read, scrutinized and photocopied by the Defendants during the Mail Watch. Defendants did not distinguish between correspondence to activists or Plaintiff's friends and family. This substantially chilled Plaintiff's intimate correspondence in addition to chilling his correspondence with activist friends."

ECF No. 71, pages 31-32. Plaintiff has provided evidence in support of his position that the Mail Watch actually deterred him from exercising his constitutional rights. By way of his own affidavit, Plaintiff explains that he "ceased submitting articles for publication and discussing prisoner rights activism and politics in general in my letters and canceled my subscriptions to the Defenestrator, the New People newspapers and the newsletter from the Islamic Human Rights Commission" because he believed that the Security Office at SCI Greene would use his subscription and/or involvement with these people and publications as "a pretext to place me on long term segregation as a threat to the security of the prison." ECF No.70-1, page 9. Plaintiff further explains that he "severely curtailed" his correspondence with activists with whom he had a personal friendship, including David Fischer, Elizabeth Anderson, Theresa Shoats, and Richard Carter[14]. Id.

Whether an inmate has met the adverse action element of a retaliation claim "will depend on the facts of the particular case." Allah, 229 F.3d at 225. The Third Circuit has held the following acts were sufficient to establish adversity in a retaliation case: "several months in disciplinary confinement, denial of parole, financial penalties, and transfer to a distant prison where his family could not visit him regularly." Richardson v. U.S., ___ F.3d ___, ___, 2012 WL 30250854, at * 2 (3d Cir. July 25, 2012) (holding that the loss of three pairs of shoes did not

---

[14] Fischer, Anderson, and Carter have provided similar evidence by way of affidavit. See ECF No. 70-2, pages 4-6 (Fischer); pages 10-11 (Anderson); and page 3 (Carter).

constitute adverse action).  See also Huertas, 476 Fed.Appx at 984 ("interfering with Huertas's personal mail addressed to his bank on three occasions, confiscating his photographs, and interfering with his receipt of funds was not sufficiently adverse to deter a person of ordinary firmness from pursuing grievances.  Simply put, more serious conduct is required to make out a retaliation claim under § 1983."); Burgos v. Canino, 358 Fed.Appx 302, 306-07 (3d Cir. 2007) (urinalysis, harassment, threats, temporary inconveniences, and denial of recreation did not rise to level of adverse action against prisoner); Mitchell, 318 F.3d at 530 (filing false misconduct reports sufficient for adverse action); Rauser, 241 F.3d at 333 (denial of parole, transfer to another prison, and financial penalties sufficient for adverse action); Allah, 229 F.3d at 225 (placement in administrative custody for two months – which "resulted in … reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement to his cell for all but five hours per week, denial of access to rehabilitation programs, and significantly, in adequate access to legal materials and assistance" -- sufficient for adverse action).

This Court finds that in this case the evidence of record satisfies the adverse action element as Plaintiff has demonstrated that he (a person of more than ordinary firmness) was deterred from exercising his constitutional rights.

### 4)  Legitimate Penological Interest

Next, Defendants assert that "the same actions would have been taken for the same legitimate penological interest of institutional security that was initially and expressly stated in the responses to Holbrook's grievances regarding these issues."  ECF No. 64, page 30.

After a plaintiff has met his initial burden to show the three elements of a *prima facie* case of retaliation, the burden then shifts to the defendant to "prove by a preponderance of the

evidence that it would have taken the same disciplinary action even in the absence of the

protected activity." Rauser, 241 F.3d at 333. This final aspect of the burden shifting framework

means that "once a prisoner demonstrates that his exercise of a constitutional right was a

substantial or motivating factor in the challenged decision, the prison officials may still prevail

by proving that they would have made the same decision absent the protected conduct for

reasons reasonably related to a legitimate penological interest." Id. at 334.

By way of their own Declarations, Defendants expressly state that in their

their actions in January and February of 2007 in instituting the Mail Watch were motivated by

concerns for institutional security at SCI Greene and were not based on any "retaliatory animus"

toward Holbrook based upon his prior writings and publications. [15]

Defendant Kingston, in his capacity as Intelligence Gathering Captain in the Security

Office at SCI Greene, explains that he conducted a records review involving Plaintiff in early

2007. ECF No. 66-2, ¶ 5. Thereafter, on January 31, 2007, Defendant Kingston issued a Field

Intelligence Report to the Intelligence Committee which explained that Plaintiff was identified as

---

[15] Defendants have also provided evidence in support of their position that Plaintiff was put on Mail Watch in December of 2007 for a legitimate penological reason. Defendants explain that Plaintiff was one of several SCI Greene inmates who received a petition from Theresa Shoats around December 6, 2007 – and that a part of this mailing included a portion of the Department of Corrections' policy and procedures manual which is confidential and not publicly disseminated. ECF No. 66-1, Declaration of Superintendent Louis Folino, ¶¶ 5-6. Theresa Shoats is the daughter of Russell Shoats, an inmate with a long history of affiliation with radical groups and with prison violence. Id. Russell Shoats was convicted of first degree murder for his involvement with a black revolutionary group that conducted an attack on a Philadelphia police guardhouse that resulted in the killing of one police officer. ECF No. 66-2, Declaration of Kingston, ¶ 14. Shoats later escaped from SCI Huntington with several other inmates and kidnapped a prison guard and his family from their home. Id. at ¶ 15. After being apprehended and returned to prison, Shoats had guns smuggled into him and he then escaped from maximum security, again taking a hostage. Id. at ¶ 16. In addition to the escapes and hostage taking, Shoats has a history of threatening and assaulting fellow inmates and of causing disruptions in the facilities in which he is incarcerated. Id. While Defendants' evidence in support of a legitimate penological interest in instituting the Mail Watch in December of 2007 is overwhelming, it need not be discussed any further since this Court is analyzing Plaintiff's retaliation claim as if it were one continuous pattern of retaliation beginning in February of 2007.

… a self-avowed activist whose written material frequently cross's [sic] the line to subversive and revolutionary. Earlier this month, the Security Office was notified of the receipt of three (3) copies of a newsletter entitled "The Don't Shank the Guard Handbook' written by Kevin Rasheed Johnson – Minister of Defense, New Akrikan Black Panther Party … The intended inmates that this newsletter was addressed too [sic] were Inmates Holbrook BL5140 …

Recently Inmate Holbrook mailed out (3) packets of his written material to address's [sic] in England. The mail was return [sic] to sender and upon my inspection of these packets they were determined to contain numerous articles that Holbrook has written and submitted to various subversive organizations over the years since his confinement at SCI Greene.

There is also included a pamphlet with Holbrook's picture on the front entitled "This man needs your support" which outlines Holbrook's victimization at the hands of the criminal justice system and his self-described membership in the Human Rights Coalition (HRC). Inmate Holbrook has long been identified to have known affiliations with the Black Panther Party, the Black Liberation Army, and is a ranking member of the Fruits of Islam.

Inmate Holbrook as described in our current security review does maintain a low profile and through the course of staff interaction will maintain and demonstrate a polite and courteous demeanor.

However, from observing his behavior during periods of conflict or his perceived negative interaction with staff, IE [sic] being pat searched on the walks or being subject to cell security searches he displays an underlying posture that he is attempting to maintain control of his temper and I would consider Holbrook to be an Inmate that could become violent in the right circumstance of a confrontation with staff.

Id.[16] By way of background information, Kingston explains that Plaintiff had been transferred

from SCI Huntington into SCI Greene in May of 2003 following an extensive investigation by

prison officials at SCI Huntington which indicated that Plaintiff had been involved in several

incidents involving inmate violence and possible prison gang related activities, and that Plaintiff

---

[16] Plaintiff argues that this Field Intelligence Report should be excluded because Defendants did not produce it in discovery despite an Order by this Court to do so. ECF No. 71, page 21. Plaintiff adds that Defendants' conduct constitutes a fraud upon the Court and that he has filed a separate motion requesting that Defendants be fined for their actions in this regard. Id. The docket does not reflect any such motion. However, this Court will entertain a motion for sanctions as to this issue. See ECF No. 73, Transcript of Motion to Compel Hearing held on November 15, 2012.

had maintained a position of rank within an inmate organization known as the Fruits of Islam[17] ("FOI").  Id.  Additionally, Kingston attached the Declaration of Unit Manager William Walters of SCI Huntington dated July of 2006 which describes Plaintiff's long history of "poor institutional adjustment" within the Department of Corrections, including information regarding:

- Plaintiff's conviction on a first degree murder charge for his involvement in the 1990 stabbing of a woman;

- Plaintiff's stabbing of a fellow inmate (Owen Bryant) at SCI Graterford in1992, arising out of an incident in which a soccer ball hit an FOI inmate;

---

[17]  The evidence before this Court reflects that, as of July 2006, the Fruits of Islam ("FOI") group had not been classified by the Department of Corrections as a "Security Threat Group" ("STG"). ECF No. 66-2, page 27, Declaration of Dennis Durrant.  However, it is common knowledge within the Department of Corrections that FOI inmates have consistently used their position within the FOI to engage in disruptive and violent activities usually associated with STGs.  Id. The FOI is affiliated with the Nation of Islam ("NOI") and utilizes a para-military structure using military rank to indicate importance of its members. Id.  FOI members are generally seen as soldiers providing protection for NOI members. Id.  Some of the nefarious activities in which the FOI has been involved include:

- A drug smuggling ring run by FOI inmates which used the "Supreme Alphabet" to send and receive coded messages regarding quantity and price of drugs;

- The FOI threatened to kill a Muslim Imam who had been hired by the Department of Corrections to conduct Muslim religious services. An investigation disclosed that the inmate was attempting to gain control over religious services conducted by the Imam for the purpose of organizing inmates for action against the federal government.

- It is common knowledge that FOI inmates engage in racketeering and extortion rings for the purpose of raising money to fund the group's activities and initiatives, that membership with the FOI can be a source for violent assaults that generally occur between FOI inmates and inmates holding membership with a different ethnic or religious group and assaults have been noted to occur between FOI members where a power struggle exists within the FOI at that institution.

Id.

- Plaintiff's involvement, while in Administrative Custody for the stabbing incident, in a security incident involving the introduction of several balloons of marijuana into the institution;

- Plaintiff's stabbing by two other inmates (only two months after he was transferred to SCI Greene to separate him from Inmate Bryant), who were associated with FOI after he attempted to end his association with the group;

- Plaintiff's June 1996 misconduct for attempted assault after he tried to strike another inmate with a sock filled with batteries;

- Plaintiff's placement in Administrative Custody in July 1996 after he struck another inmate in the face;

- Plaintiff's placement in the Special Management Unit[18] ("SMU") at SCI Greene in February of 1997;

- Plaintiff's misconduct for violation of mail rules during his incarceration at the SMU;

- Plaintiff's attempt to receive a publication titled "Mental Training of a Warrior" which included information regarding the manufacture of "explosives, … weapons, escape devices or other contraband" and writings advocating "violence, insurrection, or guerilla warfare against the government" (during his incarceration at the SMU);

- Plaintiff's release on a probationary basis and transfer to SCI Frackville after approximately one year in the SMU;

- The extension of Plaintiff's probationary status due to misconducts and his possession of gang-related material;

- Plaintiff's return to SCI Greene for re-entry into the SMU program following his receipt of two additional misconducts while on probationary status;

- Plaintiff's transfer to SCI Dallas in June of 1999 upon his completion of the SMU program a second time;

---

[18]  The Special Management Unit was developed by the Department of Corrections to provide a high level of security and control to seriously disruptive and violent inmates and to focus on restoring these inmates to stable participation within the general population of a correctional institution.

- Plaintiff's rise to the rank of Captain of the FOI after only three months in general population and his subsequent transfer out of SCI Dallas;

- Plaintiff's receipt of a misconduct for writing (phrases associated with FOI) on his cell wall, and another misconduct for possession of a metal shank in his cell while at SCI Huntingdon;

- Plaintiff's June 2001 attempted receipt of a publication titled, "Manual for the Urban Guerilla," which "facilitated escape and terrorism";

- The October 2001 confiscation of several publications and materials from Plaintiff, which included a map of terrorist base camps in Afghanistan, as well as a book containing remarks against the white race. The officer who confiscated the materials felt that they presented a possible security concern in light of the September 11, 2001 attacks;

- A June 2002 investigation into Plaintiff's request (despite his previous years-long refusal to work and his heightened security classification) for a job in the power house (which controls lighting and locking mechanisms within the institution) led to information that Plaintiff had recently risen in rank to Major in the FOI, had used his affiliation therewith to extort money and goods from other inmates, and was identifying himself as "American Taliban."

- The June 2002 investigation which led to Plaintiff's being labeled as a threat to the security of the institution and his placement in the Long Term Segregation Unit.

ECF No. 66-2, pages 11-21.

In his Declaration, Defendant Haywood, a Security Captain, indicates that he issued a Security Review to the Program Review Committee on Plaintiff on February 1, 2007. ECF No. 66-3, ¶ 6; ECF No. 66-2, ¶ 7. Haywood explains that the Security Review indicated that although Plaintiff had maintained a relatively low profile since his return to SCI Greene, Plaintiff had engaged in ongoing solicitations with known radical organizations. Id. Furthermore, Haywood noted that Plaintiff was still being monitored for security threat group activity. Id. at ¶ 7. Finally, Haywood indicates that his Security Review reflected that Plaintiff remained engaged

in actively distributing revolutionary subversive materials and was being maintained as an escape risk at SCI Greene due to his ongoing connections with organizations that are considered subversive and anti-government. Id.

Based on the Field Intelligence Report and the Security Review, Kingston sought Authorization to monitor Plaintiff's non-privileged mail in February of 2007. ECF No. 66-2, page 30. Kingston declares that "[s]pecifically, Inmate Holbrook's continued connections with radical and subversive organizations was [sic] of significant concern and it was believed that by monitoring Inmate Holbrook's non-privileged mail it could be determined whether there was any potential threat to the institutional security at SCI Greene." ECF No. 66-2, ¶ 9. William Stickman, Deputy Security of the Western Region of the Department of Corrections, approved the Mail Watch on February 6, 2007. ECF No. 66-2, page 30.

In Opposition to Defendants' evidence of their legitimate penological interest in placing Plaintiff on Mail Watch, Plaintiff argues that such is pre-text and should not be credited. Plaintiff notes that he arrived at SCI Greene in May of 2003, yet Mail Watch was not imposed upon him until four years later. ECF No. 71. Defendants were aware of Plaintiff's prior "institutional adjustment history" as well as his affiliation with and rank in the FOI in May of 2003. Plaintiff also claims that Defendant Kingston has previously been admonished by the courts for placing false information in prisoner's files and for doing shoddy investigations. Yet, contrary to Plaintiff's assertions, the precipitating event in early 2007 was the discovery of three copies of the newsletter entitled "Don't Shank the Guard Handbook," one of which was addressed to Plaintiff. ECF No. ECF 66-2, ¶ 5. It was this event, along with the written materials (returned from England) and Plaintiff's violent history, which provided the basis for the request for Mail Watch.

Moreover, while pretext is an available avenue to rebut a legitimate nondiscriminatory reason put forward by an employer-defendant defending against a retaliation claim in an employment setting[19], the Third Circuit has not recognized pretext in retaliation claims arising in a prison setting. See, for example, Carter v. McGrady, 292 F.3d 152 (3d Cir. 2002) (noting that even if prison officials were motivated by retaliatory animus toward jailhouse lawyers, there was sufficient evidence of plaintiff's misconduct offenses to conclude that this misconducts would have issued notwithstanding his jailhouse lawyering). Therefore, not only has Plaintiff not opposed the evidence produced to effect a genuine issue of material fact, his only basis for opposition is pretext, which is not recognized for these purposes. Defendants are entitled to judgment as a matter of law.

### D. Legal Mail Claim

Besides his retaliation claim, Plaintiff also advances a claim based upon a single instance of the opening of his legal mail. The evidence before this Court reflects that a piece of Plaintiff's legal mail was opened outside of his presence on January 4, 2008. See ECF No. 6, Original

---

[19] The burden shifting framework in an employment case is similar to the retaliation case of one that arises in the prison setting in that first the plaintiff must establish the three elements of a *prima facie* case, and then the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-06 (1973). See also Rauser, 241F.3d at 333-34 (joining other several Circuit Courts of Appeal in applying the so-called *Mt. Healthy* burden shifting framework to a prison retaliation claim). However, it is at this stage that the retaliation claims arising out of employment contexts and prison contexts differ. In an employment case, once the employer meets the burden of production of some nondiscriminatory reasons for the adverse employment action, the burden rebounds to the plaintiff who must then show by a preponderance of the evidence that the employer's explanation is pretextual. See Olivieri v. County of Bucks, 2012 WL 5235684, at *5 (3d Cir. Oct.24, 2012) citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Complaint, ¶¶ 38-40[20]; ECF No. 6-15, Grievance dated January 4, 2008; ECF No. 66-7, Declaration of Dean Geehring, Mail Inspector Supervisor, ¶¶ 8, 9.

This claim is time-barred by the statute of limitations. Although the federal civil rights laws do not contain a specific statute of limitations for § 1983 actions, it is well established that the federal courts must look to the relevant state statute of limitations for personal injury claims. Samerica Corp., Del., Inc. v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998) (internal citations omitted). Thus, based on Pennsylvania's applicable statute of limitations, a § 1983 claim must be filed no later than two years from the date of the alleged violation. See Urrutia, 91 F.3d 451; McCreary, 2011 WL 1848333, at *2.

In this case, Plaintiff's Original Complaint was received by the Clerk of Courts on February 24, 2010. See ECF No. 1. Plaintiff dated the complaint February 10th, but he later claims that he composed it on February 20th (see ECF No. 29, page 4). Even giving Plaintiff the benefit of the prison mailbox rule[21] and the benefit of the doubt as to the date he gave the complaint to prison officials for mailing, the earliest possible date is February 10th. Any claims

---

[20] Although the Original Complaint lists January of 2007 as the date, the exhibits attached to the Original Complaint by Plaintiff indicate that the correct date is January of 2008. See ECF No. 6-15.

[21] An inmate's pleadings are deemed filed at the moment the inmate delivers the documents to prison officials to be mailed, not the date they were received by the court. Houston v. Lack, 487 U.S. 266 (1988). See also Nichols v. Bowersox, 172 F.3d 1068, 1074 (8th Cir. 1999) (explaining "the 'prison mailbox rule' which, as the name suggests, would establish the date of filing as the date on which the prisoner puts the proverbial 'letter' in the proverbial 'mailbox'--in other words, the date on which he or she deposits the petition in the prison mail system."); Satterfield v. Johnson, 434 F.3d 185, 189 fn.3 (3d Cir. 2006); Longenette v. Krusing, 322 F.3d 758 (3d Cir. 2003); Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (prison mailbox rule provides that "a pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court."). However, the prison mailbox rule only creates a presumption, which may be overcome in the appropriate circumstances. "Absent proof of the exact date of delivering the ... petition to the prison authorities, the court will presume the date whereon Plaintiff signed his ... petition is the date he gave the prison authorities his ... petition for mailing." West v. Lockett, 2009 WL 1270225, at *4 n.2 (W.D. Pa. 2009).

raised by Plaintiff arising from events that occurred prior to February 10, 2008, are barred by the applicable statute of limitations. The continuing violations doctrine is not applicable to save Plaintiff's claim as the doctrine "does not apply when plaintiffs are aware of the injury at the time it occurred." Muhammad, 2012 WL 1681861, at * 2 (3d Cir. May 15, 2012) quoting West, 45 F.3d at 755, and Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 417 n6 (3d Cir. 2003). Here, Plaintiff was clearly aware of his injury as he filed a grievance immediately.

   Accordingly, the motion for summary judgment should be granted as to this claim.


## III. CONCLUSION

   For the foregoing reasons, it is respectfully recommended that that Defendants' motion for summary judgment [ECF No. 63] be granted. The Clerk of Courts should be directed to close this case.

   In accordance with 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72, the parties must seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of Objections to respond thereto. See Fed.R.Civ.P. 72(b)(2). Failure to file timely objections may constitute a waiver of appellate rights. See Brightwell v. Lehman, 637 F.3d 187, 194 n.7 (3d Cir. 2011); Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).


          /s/ Susan Paradise Baxter
          SUSAN PARADISE BAXTER
          United States Magistrate Judge

Dated:  November 26, 2012